Filed 5/15/25  P. v. Martinez CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT
### DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B336031 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  KA088341) |
| v. | |
| LUIS MARTINEZ, | **ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING** |
| Defendant and Appellant. | [NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on April 22, 2025, is modified as follows:

On page 10, after the heading "**Procedural History**", delete third full paragraph.

Appellant's Petition for Rehearing is denied.

There is no change in judgment.

_____

BAKER, Acting, P. J.        MOOR, J.        KIM, J.

Filed 4/22/25  P. v. Martinez CA2/5 (unmodified opinion)

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LUIS MARTINEZ,<br><br>    Defendant and Appellant. | B336031<br><br>(Los Angeles County Super. Ct. No. KA088341) |

APPEAL from an order of the Superior Court of Los Angeles County, H. Clay Jacke II, Judge.  Affirmed.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews and Gary A. Lieberman, Deputy Attorneys General for Plaintiff and Respondent.

Luis Martinez appeals the trial court's order denying his petition for vacatur of his conviction and resentencing for the murder of Marquise Le Blanc. The trial court denied Martinez's petition following an evidentiary hearing held pursuant to Penal Code[1] section 1172.6, subdivision (d)(3). On appeal, Martinez argues that the evidence was insufficient to support his conviction for directly aiding and abetting the murder with implied malice. We affirm the trial court's order.

## FACTS

### A. *The Murder*

On April 17, 2009, eighteen-year-old Le Blanc went to a large party in Pomona with friends.[2] The boys were not familiar with Pomona. They learned about another party in Pomona through a "party text." They were not able to find the party, but as they were driving they saw a bunch of kids parking cars and walking down the street. The boys asked if there was a party and were told there was, so they decided to park and go to the party.

The party was held at Leslie C.'s house. She asked her adult cousin, Deborah M., to help her set up the party and to arrange for security. Leslie C. wanted to exclude certain boys from the party, including Martinez, Adam Delgado, Victor

_____

[1] All further statutory references are to the Penal Code.

[2] The party was attended by teenagers mostly between the ages of 13 and 19 years old, so we refer to the party-goers using terms that describe minors. Martinez was 15 years old at the time. No disrespect is intended.

2

Guillen, Edgar Cisneros, and "their . . . crowd" because they were "troublemakers." Deborah M.'s boyfriend, Joshua R., who worked as a security guard at a nightclub, provided security along with two other people. The party was held in Leslie C.'s back yard. The kids entered through the front gate where security was stationed. No one was allowed inside the house. Deborah M. mostly stayed inside with her young son and Leslie C.'s mother.

Deborah M. was at the front gate talking to Joshua R. when Le Blanc arrived. Le Blanc seemed cheerful and excited to go to the party. Le Blanc was one of the few Black people there. The majority of the party-goers were Hispanic. By the time Le Blanc arrived, the backyard had become very crowded. Martinez and the other boys that Leslie C. had intended to exclude tried to enter through the front door of the house, but a girl slammed the door shut. The boys went to look for another entrance. Leslie C. called security, but security was unable to find Martinez and the other boys.

Le Blanc tried to dance with several girls unsuccessfully. A Hispanic boy who was wearing a jacket with "Pomona" written on it walked up to Le Blanc. The boy pointed to a tattoo on his neck and asked Le Blanc if he had seen it. Le Blanc told the boy he did not want any problems and then walked away.

Later, Le Blanc was in the dance area of the backyard surrounded by Martinez, Guillen, Cisneros, and Ralph Alfaro. The boys started arguing with Le Blanc. The argument escalated and Delgado punched Le Blanc in the face. Le Blanc pulled out a gun and waved it around. Le Blanc then asked "if anyone wanted to fuck with him now." People began to run and yell "He has a gun."

3

Someone in the crowd yelled "He can't shoot us all.  Get him."  Multiple people yelled "Get that [derogatory racial epithet]!" and "Kill that [derogatory racial epithet]!" several times.  Delgado grabbed a piece of construction wood and shouted "Fuck that [derogatory racial epithet]!"  Le Blanc ran toward the front gate.  A large group of people, including Martinez, Delgado, and Alfaro chased Le Blanc.  The mob knocked Le Blanc down on the front stairs, and punched and kicked him.

Deborah M. had seen Le Blanc waving the gun in the backyard through the window.  She was afraid for her son and ran to the side door to lock it.  Deborah M. initially saw approximately 10 to 13 guys attacking Le Blanc.  More people were behind them, rushing forward to join the attack.  Le Blanc was hunched over on the front steps.  He was on his knees surrounded by a group of male Hispanics.  Deborah M. testified that "[t]hey were around him punching him, kicking him, just beating the life out of him."  Martinez admitted that he was in the group.  He participated in the beating and punched Le Blanc more than twice while Le Blanc was cowering on the stairs.  Deborah M. went outside, "because here's this guy on the front steps covering himself, and it's just so many guys just beating the life out of him."  She testified that they were yelling "Oh, get that [derogatory racial epithet].  Get that [derogatory racial epithet].  Get that [derogatory racial epithet].  That's what he gets.  Get him.  Get him.  Don't let him get away."  "They were punching him with closed fists, to the point where you could hear as they were punching him the thud sounds.  Like, when you hit somebody really hard and it just makes that sound on flesh, you could hear it.  And they were just kicking and just beating him really bad."  Deborah M. saw the mob stomping on Le Blanc.

Le Blanc had his hands over his head. Deborah M. could see Le Blanc's hands clearly. He was not holding the gun.

Deborah M. screamed for the mob to stop, but the beating continued. She was able to push some people back and help Le Blanc. The males were hitting her as she was trying to free Le Blanc from the crowd. Leslie C.'s mother came outside and tried to help Deborah M. One of the males swung his fist at Deborah M.'s head. She moved her face out of the way and the blow hit her arm and her aunt's thigh. Deborah M. was able to pull Le Blanc up and push the gate open. She screamed at Le Blanc to run. The crowd pushed Deborah M. back. Le Blanc looked exhausted, but he was able to run down the street. A group of males, including Martinez, chased after him. Deborah M. later identified for the police approximately 20 of the people who were involved in the beating. All of the people she identified were Hispanic males.

As Le Blanc fled, someone called Deborah M. a "[derogatory racial epithet] lover" and another person threw a glass bottle at her and hit her feet. Deborah M. testified, "I got scared, because I thought that what had happened to [Le Blanc], they would start doing to me. So I backed off." She was afraid that the mob was so angry that they would come back and turn on her after they "got" Le Blanc. Deborah M. went to close and lock the gate so that no one could get in or out. As she did so, she tripped over the gun that Le Blanc had been waving in the back yard. Joshua R. picked up the gun and took it away. Deborah M. saw a male running back from the direction the mob had gone. He retrieved what looked like a gun from a car parked across the street and ran back toward the mob.

Sandra A. lived down the street from Leslie C. She and her husband, Pablo A., heard screaming and looked out the window to see what was happening. Sandra A. saw a group of 20 to 30 kids running in the street toward her house. They gathered in one area and a fight broke out. Everyone in the group was attacking one kid—Le Blanc—kicking and hitting him. Pablo A. estimated that there was a group of 20 to 25 people beating Le Blanc. Sandra A. testified, "They were . . . hitting him, just—there was just so many of them, and again, it was just shocking to see all that happening." Le Blanc was lying on the ground and appeared unconscious. Sandra A. saw a male pull out a gun and shoot Le Blanc. The male got into a dark SUV and drove away.

Party-goer Arturo C. followed the mob down the street. Arturo C. saw Alfaro knock Le Blanc to the ground. Le Blanc was defenseless and unable to fight back. Le Blanc got "stomped" by 15 to 20 people after he was on the ground. Arturo C. stole Le Blanc's shoes as Le Blanc was being beaten. He saw Delgado stab Le Blanc in the chest. Earlier in the evening, Delgado had shown Arturo C. a pocket knife and told him not to worry if anything happened because he had the knife. As Arturo C. was leaving he heard gunshots.

Deborah M. also heard a gunshot. She heard someone yell, "Pomona, Pomona." Several people were yelling, " 'They're coming back. They're come back. They have a gun. They have a gun.' " Girls were screaming and running.

When he arrived at the scene, City of Pomona Police Officer Melvon Bird saw 30 to 40 kids running away. Le Blanc was lying face down on the side of the road with his feet up on the sidewalk. Le Blanc did not appear to be breathing and did not respond to the officer. There was a bullet casing next to his head. Officer

Bird felt for a pulse and found none. He saw that there was blood in Le Blanc's ears and a puddle of blood under his head. The officer called for paramedics.

## B.     *Cause of Death and Injuries*

Deputy Medical Examiner Dr. Lisa Scheinin of the Los Angeles County Coroner's Office determined that the cause of Le Blanc's death was a combination of stabbing and gunshot wounds. He was stabbed three times, including a stab to the heart. After the stabbing, Le Blanc was turned face down and shot once through the back of the head. In addition to the stabbing and gunshot wounds, Le Blanc suffered multiple head injuries, including abrasions, contusions, and shallow lacerations. His nasal bridge and ear cartilage were fractured. Dr. Scheinin opined that Le Blanc likely suffered the injuries as a result of being kicked in the head and stomped on the face. She opined that it requires significant force to break cartilage.

## C.     *Gang Evidence*

City of Pomona Police Officer Greg Freeman testified that the 12th Street gang (12th Street) is the largest Hispanic gang in Pomona. Officer Freeman explained that the Hispanic gangs in Pomona are "very territorial," and that the party was within 12th Street territory. 12th Street is notorious for its hatred of Black people. The officer explained that members of a gang are people who live for the gang. They have no other job and are focused on bettering the gang at all times. Associates are people who have a life outside the gang that may include a job or school but "when

7

they're called upon by the gang, they drop everything" and go to assist the gang. Tagging crews are bonded groups of younger people who operate within a gang's territory and are a source of future recruits for the gang. Tagging crews commit crimes that benefit the gang. The Tinto Killers (Tinto Killers) or TK is a tagging crew that operates within 12th Street's territory. "Tinto Killers" means Black Killers. MBK is another tagging crew that feeds into 12th Street. 12th Street engages in a wide variety of criminal offenses; one of their major activities is murder. Gang members increase respect for their gang by committing crimes. A 12th street member would garner the most respect for killing a Black person. 12th Street is also known as "Pomona 12th Street" and "The Sharkies Gang." Their symbols include sharks, the letter "P", the number "12", and "P-12."

Given hypothetical facts that mirror this case and a prior contact that Officer Freeman had with Martinez, Officer Freeman opined that the person in the hypothetical was "at least an associate" of the hypothetical gang. Guillen and Cisneros were both members of 12th Street. Delgado was a member of MBK in 2009, but belonged to 12th Street by the time of trial. Alfaro was a member of Tinto Killers in 2009, and later became a 12th Street member.

Arturo C. also knew Alfaro to be a member of Tinto Killers. He said that many people involved in the beating were members of Tinto Killers.

### D.    *Martinez's Interview with Police*

In an interview with police, Martinez initially said that he did not go into the back yard when he arrived at the party

8

because there was a fight starting.  After he was confronted with information about his participation in the beating, Martinez was more forthcoming.

Martinez confirmed that there was a Black male in the dance area and that people around the Black male (Le Blanc) were starting a fight.  Delgado, Guillen, Cisneros, and Alfaro were part of the group fighting with Le Blanc.  Things became heated and Le Blanc pulled out a gun.  Delgado punched Le Blanc in the face.  Someone in the crowd yelled "He can't shoot us all.  Get him."  Le Blanc ran for the gate.

Martinez, Delgado, and Alfaro gave chase.  Le Blanc was knocked down on the stairs, punched, and kicked.  Martinez admitted that he punched Le Blanc more than twice while Le Blanc was cowering on the stairs.  He described the beating in the same terms that Deborah M. had—he said that Le Blanc was kicked, punched, and "stomped out."

Martinez admitted that he was part of the mob that chased Le Blanc after he fled through the gate.  Martinez, Alfaro, Delgado, Cisneros, and Prado led the pack.  Alfaro knocked Le Blanc to the ground and the beating continued.  Le Blanc appeared to be unconscious to Martinez as Le Blanc's eyes were closing.  Delgado stabbed Le Blanc twice in the upper torso.  Alfaro stood over Le Blanc and shot him once.

Martinez denied assaulting Le Blanc after he chased him from the stairs.  He told police that Delgado was a member of 12th Street and Alfaro was a Tinto Killer.

## PROCEDURAL HISTORY

The People tried Martinez for first degree murder on two theories—(1) direct aiding and abetting and (2) aiding and abetting under the natural and probable consequences doctrine. The People did not allege that Martinez stabbed or shot Le Blanc. He was charged based on his role in the mass beating.

The jury found Martinez guilty of the first degree murder. The jury further found that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)), and that a principal personally and intentionally discharged a firearm proximately causing the victim's death (§ 12022.53, subds. (d), (e)(1)). The trial court sentenced Martinez to 50 years to life in state prison. Another panel of this court affirmed the judgment.

Following our Supreme Court's decision in *People v. Chiu* (2014) 59 Cal.4th 155, which held that an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine, this court reversed Martinez's convictions and permitted the prosecution to retry Martinez or accept a reduced conviction of second degree murder. (*People v. Prado et al.* (Jan. 13, 2015, B243204 [nonpub. opn.].) The People elected not to retry Martinez, and his conviction was reduced.

In February 2019, Martinez, in pro. per., petitioned to be resentenced under former section 1170.95, now section 1172.6. The People opposed the petition.

On March 22, 2019, the trial court denied Martinez's petition because the court concluded that, based on the facts as

10

recited in our unpublished opinions, Martinez intended to kill Le Blanc.

On appeal, this court concluded that Martinez was not ineligible for relief as a matter of law, and that the trial court had improperly decided the petition without appointing counsel. We reversed the trial court's order and remanded the matter for further proceedings.

On remand, the trial court appointed counsel, and the parties briefed the matter. Based on the fact that Martinez had been tried under a legally valid theory (direct aiding and abetting) and an invalid theory (natural and probable consequences aiding and abetting), the trial court issued an order to show cause and held an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3).

Following the hearing, the trial court again denied Martinez's petition. The court found that the People had met their burden of proving beyond a reasonable doubt that Martinez was guilty of aiding and abetting implied malice murder.

Martinez timely appealed.

## DISCUSSION

### A. *Legal Principles*

#### 1. <u>Section 1172.6</u>

"Effective January 1, 2019, the Legislature passed Senate Bill 1437 'to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the

11

actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" *People v. Lewis* (2021) 11 Cal.5th 952, 959.) As relevant here, the bill eliminated second degree murder liability predicated on the natural and probable consequences doctrine. (§ 188, subd. (a)(3), as amended by Stats. 2018, ch. 1015, § 2; *People v. Strong* (2022) 13 Cal.5th 698, 707, fn. 1.)

" '[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.' [Citation.]" (*People v. Reyes* (2023) 14 Cal.5th 981, 990 (*Reyes*).) "[A] defendant may directly aid and abet an implied malice murder. (See *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 588–591; *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 499; *People v. Powell* (2021) 63 Cal.App.5th 689, 710–714, (*Powell*); see also *People v. Langi* (2022) 73 Cal.App.5th 972, 979–983.)" (*Ibid.*)

Senate Bill No. 1437 also added former section 1170.95, now section 1172.6, to provide a procedure for those convicted of murder to seek resentencing. (§ 1172.6, subds. (a)-(c).) If the sentencing court determines the petitioner has made a prima facie showing, the court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction. (§ 1172.6, subds. (c), (d)(1).) At the evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder

. . . under California law as amended by the changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).)

"[A] trial court's denial of a section 1172.6 petition is reviewed for substantial evidence. [Citation.] Under this standard, we review the record ' " 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty [of murder under a still-valid theory] beyond a reasonable doubt.' " ' " (*Reyes*, *supra*, 14 Cal.5th at p. 988.)

We will not reverse unless there is no hypothesis upon which sufficient substantial evidence exists to support the trial court's decision. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) We must "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Jones* (1990) 51 Cal.3d 294, 314.) "The same standard applies when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "An appellate court must accept logical inferences that the [trier of fact] might have drawn from the circumstantial evidence." (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

### 2.   Implied Malice Murder

"Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' (*People*

13

*v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).)" (*Reyes*, *supra*, 14 Cal.5th at p. 988.) "[T]he defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[ ] a high degree of probability that it will result in death." ' (*Knoller*, *supra*, 41 Cal.4th at p. 152; see *ibid.* [under the objective component of implied malice, ' " 'dangerous to life' " ' means the same thing as a ' "high degree of probability that" ' the act in question ' "will result in death" ']; *People v. Cravens* (2012) 53 Cal.4th 500, 513 (conc. opn. of Liu, J.) ['Although an act that will certainly lead to death is not required, the probability of death from the act must be more than remote or merely possible[]'].)" (*Reyes*, *supra*, 14 Cal.5th at p. 989.)

### 3. <u>Direct Aiding and Abetting Implied Malice Murder</u>

" '[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. ([*People v. McCoy* (2001) 25 Cal.4th 1111, 1122.]) In the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in

14

conscious disregard for human life.' [Citations.]" (*Reyes, supra,* 14 Cal.5th at pp. 990–991.)

In contrast, " 'the natural and probable consequences doctrine did not require that the aider and abettor intend to aid the perpetrator in committing a life-endangering act . . . . What was natural and probable was judged by an objective standard and it was enough that murder was a reasonably foreseeable consequence of the crime aided and abetted.' (*Powell, supra,* 63 Cal.App.5th at p. 711, fn. 26.)" (*Reyes, supra,* 14 Cal.5th at pp. 990–991.)

## B.    *Analysis*

Martinez argues that the evidence is not sufficient to support the additional elements required for directly aiding and abetting implied malice murder.  He asserts there is not substantial evidence that (1) he aided and abetted a life-endangering act rather than a mere assault, (2) he knew that the perpetrators would stab and shoot Le Blanc; and (3) he intended to aid and abet the shooting and the stabbing.

Martinez likens this case to *Reyes, supra,* 14 Cal.5th 981, which he argues is factually similar.  *Reyes* is readily distinguishable.  Reyes was a teenage gang member.  (*Id.* at p. 985.)  He was in a park with fellow gang members when Francisco Lopez showed the group a revolver he was carrying. (*Ibid.*)  A couple of hours later, some members of the gang rode their bicycles into rival gang territory.  (*Ibid.*)  Someone in the group called out to people in a passing car, " 'Hey, Homey, stop. We want to talk to you.' " (*Ibid.*)  The car sped up and the gang members on bicycles followed it.  (*Ibid.*)  The car then made a U-

15

turn and drove back past the group. (*Ibid.*) A single gunshot sounded, and the group dispersed. (*Ibid.*) The bullet struck the driver of the vehicle in the head and killed him. (*Ibid.*) Reyes was involved in a separate assault about 40 minutes later, and he personally used the murder weapon in that separate assault. (*Ibid.*)

At trial, the People argued that Reyes was guilty of aiding and abetting murder under the natural and probable consequences doctrine because he intended to aid Lopez in either committing an assault or disturbing the peace, or alternatively, because he had conspired with Lopez to commit one of those two target offenses. (*Reyes, supra*, 14 Cal.5th at p. 984.) Reyes was convicted of second degree murder. (*Ibid.*)

Years later, Reyes petitioned for resentencing under Penal Code former section 1170.95. (*Reyes, supra*, 14 Cal.5th at p. 986.) Reyes argued that the evidence was not sufficient to show that he committed an act that helped, encouraged, or facilitated Lopez in the shooting. (*Id.* at pp. 986–987.) The resentencing court found beyond a reasonable doubt that Reyes was guilty of implied malice murder. The court specifically found that "(1) Reyes intentionally committed the act of traveling 'along with several other gang members, one of which [was] armed, . . . to rival gang territory'; (2) '[t]he natural and probable consequences of the act were dangerous to human life'; (3) Reyes knew his act of traveling to rival gang territory was dangerous to human life; and (4) he acted deliberately and with conscious disregard of that danger." (*Id.* at p. 987.) The Court of Appeal affirmed the trial court's order. (*Id.* at p. 984.)

The Supreme Court observed that although the resentencing court found Reyes guilty as a direct perpetrator of

implied malice murder, at trial the prosecution relied exclusively on aiding and abetting principles. (*Reyes*, *supra*, 14 Cal.5th at p. 988.) In an abundance of caution, the Supreme Court addressed the sufficiency of the evidence supporting both theories. (*Ibid.*)

The Supreme Court held that the evidence was insufficient to show that Reyes directly perpetrated implied malice murder, stating: "On this record, it cannot be said that Reyes committed an act that 'proximately caused' [the victim's] death. [Citation.] The prosecutor proceeded on the theory that Lopez shot [the victim], and no evidence was presented that Reyes's conduct was a 'substantial factor' that contributed to the shooting. [Citation.] The evidence established that Reyes proceeded to an area on the edge of territory belonging to a rival gang and, alongside the other bikers, chased after [the victim's] car. But acts that merely create a dangerous situation in which death is possible depending on how circumstances unfold do not, without more, satisfy this causation requirement. There was no evidence that Reyes's acts precipitated or provoked the shooting. And there is no reason to believe that the killing of [the victim] would not have occurred if Reyes had not accompanied his fellow gang members on the ride or participated in the chase. [Citation.] Reyes's acts of bicycling into rival territory and chasing after [the victim's] car with Lopez and other fellow gang members were too attenuated in the chain of events to have proximately caused the killing; any causal link between Reyes's conduct and [the victim's] death is tenuous at best." (*Reyes*, *supra*, 14 Cal.5th at pp. 988–989.) Additionally, the court held that there was insufficient evidence that " 'the act in this case[—]the defendant, along with several other gang members, one of which [was] armed, traveled to rival gang

17

territory'—was dangerous to life such that it satisfied the actus reus element of implied malice murder." (*Id*. at p. 990.)

Next, the Supreme Court held that the resentencing court's finding that Reyes directly aided and abetted implied malice murder was based on an error of law. (*Reyes*, *supra*, 14 Cal.5th at p. 990.) Specifically, the resentencing court failed to recognize that "implied malice murder requires, among other elements, proof of the aider and abettor's knowledge and intent with regard to the *direct perpetrator's* life endangering act." (*Id*. at p. 991.) "[A]ssuming the life-endangering act was the shooting, the trial court should have asked whether Reyes knew that Lopez intended to shoot at the victim, intended to aid him in the shooting, knew that the shooting was dangerous to life, and acted in conscious disregard for life." (*Id*. at p. 992.) The Supreme Court held that the murder conviction could not be sustained on a direct aiding and abetting theory of implied malice murder. (*Ibid*.) However, because it was " 'uncertain whether the trial court would have reached the same result using correct legal standards[]' " the court reversed the judgment and directed the Court of Appeal to remand the matter to the trial court for further proceedings. (*Ibid*.)

Here, Martinez attempts to analogize his case to Reyes's case by confining the life-endangering acts that occurred in this horrific attack to the final fatal stabbing and shooting. He points to the medical examiner's testimony—that the stabbing and the shooting caused Le Blanc's death—as evidence that the mass beating before the stabbing and shooting was not life-endangering. Martinez posits that "[f]ist-fighting among teenagers, even when one individual is greatly outnumbered, cannot be considered an act the natural consequences of which

18

are dangerous to life. . . . Otherwise, every schoolyard would routinely be the site of incidents involving implied malice, an obvious overextension of that concept." "According to the medical evidence . . . the victim would have survived the attack had it not been for the subsequent actions of the two individuals who stabbed and shot him."

Implied malice murder, as explained in *Reyes*, is not so limited. " '[A]n act that will certainly lead to death is not required[.]' " (*Reyes*, *supra*, 14 Cal.5th at p. 989.) Rather, the act " ' "must have been a substantial factor contributing to the result, rather than insignificant or merely theoretical." ' [Citation.]" (*Id*. at p. 988.) The question is not whether Le Blanc would have actually survived the attack if not for the stabbing and shooting—the questions are whether there was a high probability that the mass beating would lead to Le Blanc's death, and whether it did in fact contribute substantially to his death. We answer both those questions in the affirmative.

We agree with the People that unlike the act in *Reyes*— bicycling into rival gang territory with other gang members, one of whom was armed—in this case the mass beating of Le Blanc was a life-endangering act. This was no schoolyard fist-fight. This case bears striking similarities to *People v. Schell* (2022) 84 Cal.App.5th 437 (*Schell*). There, the defendant appealed following the trial court's denial of his section 1172.6 petition. (*Id*. at p. 440.) After an evidentiary hearing, the trial court found beyond a reasonable doubt that the defendant aided and abetted implied malice murder. (*Ibid*.) The defendant was one of at least eight attackers who participated in a mass beating of a lone victim. (*Ibid*.) While some of the other attackers used a bat and a shovel to strike the victim, the defendant did not supply or

19

wield a weapon, but used his hands and feet in the "vicious assault."**3** (*Id.* at pp. 440, 443.) The killing was committed in retaliation for perceived "disrespect" of the attackers, who were gang members. (*Id.* at p. 440.) The appellate court concluded that the defendant's presence at the scene, his companionship with the other attackers, his participation, his motivation, and his conduct before and after the fatal attack constituted substantial evidence to support the conclusion that the defendant aided and abetted an implied malice murder. (*Id.* at p. 443.) In reaching this conclusion, the appellate court stated: "The trial court could reasonably infer that appellant knew [the victim] was repeatedly being hit in the head with a shovel and bat and that he intended to aid those acts by participating in the assault. The blows to [the victim's] head were loud enough to be heard by several neighbors, some of whom heard someone yell, 'Stop it' and '[y]ou're killing him.'" (*Ibid.*)

Here, evidence was presented that the attackers were predominantly gang members who despised Black people. The mob that attacked Le Blanc was filled with people who belonged to Tinto Killers and 12th Street, groups that were notorious for their hatred of Black people. The tagging crew's name translated to Black Killers. One of 12th Street's primary activities was murder. A witness testified that he repeatedly heard people in the crowd yelling "Get that [derogatory racial epithet]" and "Kill that [derogatory racial epithet]." Like the defendant in *Schell*, Martinez attacked Le Blanc as one of a very large number of gang members and taggers working together. Le Blanc was even

---

**3** Evidence was presented that the victim was stabbed, but the trial court expressly stated that its ruling " '[did] not depend on the knife.' " (*Schell, supra*, 84 Cal.App.5th at p. 441.)

more severely outnumbered than the victim in *Schell*—a mob of 10 or more people began the attack on Le Blanc; they were closely followed by another large group of people attempting to join them. Deborah M. testified that Le Blanc was down on his knees on the stairs surrounded by a group of males who were punching him so hard that she could hear "thud sounds" upon impact. As Martinez himself put it, the attackers "stomped [Le Blanc] out" on the stairway. By that time, Le Blanc was unarmed and was trying to cover his head with his hands. Deborah M. testified three times that the attackers were "beating the life out of" [Le Blanc]. On cross-examination, defense counsel questioned her description of the beating, asking: "I take it that you are saying that because of what took place later that night; right?" Deborah M. responded, "No. Just by seeing what I had seen in front of my eyes at that very moment."

If Deborah M. had not managed to open the gate, there is a high probability that Le Blanc would have been beaten to death in the back yard. There was no indication that the mob intended to cease beating Le Blanc, who was visibly unarmed by the time he reached the stairs. Like the people in *Schell* who witnessed the beating, Deborah M. yelled for the mob to stop, but they persisted. They physically attacked and injured Deborah M. They also injured Deborah M.'s aunt, whose only involvement was attempting to facilitate Le Blanc's escape. Contrary to Martinez's assertions, Le Blanc's flight did not usher in a new "phase" of the attack in which he was a mere observer. There was no pause in the mob's pursuit of Le Blanc. Numerous members of the crowd immediately chased Le Blanc, knocked him to the ground, and resumed beating him relentlessly even after he appeared to be unconscious.

Although the beating may not have been the cause of death, it was unquestionably a life-threatening act. Absent intervention, there was a very high probability that the beating would lead to Le Blanc's death, in one manner or another. The evidence demonstrates that the attack was vicious and unrelenting from inception. The goal, as several of the participants loudly proclaimed, was to kill Le Blanc.

Once the mass beating is properly identified as a life-endangering act, Martinez's other arguments fall to the wayside. He cannot and does not contend that his actions did not contribute to the mass beating, that he did not know the perpetrators intended to beat Le Blanc so severely that his life would be endangered; that he did not intend to aid and abet the mass beating; or that he did not act with conscious disregard for Le Blanc's life. There is substantial evidence that Martinez aided and abetted the murder with implied malice.

## DISPOSITION

We affirm the trial court's order denying Martinez's petition for resentencing pursuant to section 1172.6.

NOT TO BE PUBLISHED.


                                        MOOR, J.

WE CONCUR:



BAKER, Acting, P. J.                    KIM (D.), J.


22